

KOG:USAO#2019R0872
HEE 12/8/21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. GJH 21cr480 |
| v. | (Conspiracy, 18 U.S.C. § 371; Forfeiture, 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c)) |
| AMIRREZA RAHVARIAN and BEHROUZ MOKHTARI, | UNDER SEAL |
| Defendants. | |

...oOo...

## INDICTMENT

The Grand Jury for the District of Maryland charges:

### General Allegations

At all times relevant to this Indictment:

### A. Applicable Legal Provisions

1. The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1707, grants the President of the United States the authority to deal with unusual and extraordinary threats to the national security, foreign policy or economy of the United States. Pursuant to that authority, the President may declare a national emergency through Executive Orders that have the full force and effect of law. Among other things, IEEPA empowers the President to impose economic sanctions on a foreign country.

2. On March 15, 1995, the President issued Executive Order 12,957, which found that the actions and policies of the Government of Iran (GOI) constituted an unusual and extraordinary threat and declared a national emergency under IEEPA to deal with that threat. In

1

two subsequent Executive Orders in 1995 and 1997, the President imposed comprehensive sanctions on Iran and clarified the original declaration of a national emergency. Since 1997, the President has continued the national emergency with respect to Iran and the 1995 and 1997 Executive Orders.

3. To implement the sanctions, the Secretary of the Treasury, through the Office of Foreign Assets Control (OFAC), promulgated the Iranian Transactions and Sanctions Regulations (ITSR).

4. Absent permission from OFAC in the form of a license, the ITSR prohibit, among other things, "the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, technology, or services, to Iran … including the exportation, re-exportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that: (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or (b) Such goods, technology, or services are intended specifically for use in the production of, for comingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the government of Iran."

5. The ITSR also prohibit any transaction by any U.S. person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, or cause a violation of the ITSR.

6. The ITSR further prohibit a United States person, wherever located, from engaging "in any transaction or dealing related to (1) goods or services of Iranian origin or owned or controlled by the Government of Iran; or (2) goods, technology, or services for

2

exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran."

B. **The Defendants and Relevant Entities.**

7. **AMIRREZA RAHVARIAN ("RAHVARIAN"),** a native of Iran, became a naturalized United States citizen in about September 2009. **RAHVARIAN** left the United States on or about March 13, 2016, and has not returned. Prior to his departure in 2016, **RAHVARIAN's** residence was located in College Park, Maryland. **RAHVARIAN** used the email account rezarahvarian[@]gmail.com ("RAHVARIAN GMAIL account") and rahvarian[@]farashimirooz.com ("RAHVARIAN FSR account").

8. **BEHROUZ MOKHTARI ("MOKHTARI"),** a native of Iran, became a naturalized United States citizen in about August 2008. Beginning in or before 2017, the exact date being unknown to the Grand Jury, **MOKHTARI** was involved with multiple businesses located in Iran and the United Arab Emirates. Those businesses included, among others, Fara Shimi Rooz Co ("FSR"); Ayegh Isfahan Manufacturing Company; World Trade Hall ("WTH"); and Bitubiz FZE ("Bitubiz") (hereinafter referred to collectively as "the FSR Network"). **MOKHTARI** used multiple emails accounts, including Behrouz_mokhtari2[@]yahoo.com ("BEHROUZ YAHOO account"), Behrouzmokhtari[@]aol.com ("BEHROUZ AOL account"), and ben[@]mokhtari.biz ("MOKHTARI BIZ account").

9. FSR was an Iranian petrochemical company located in Tehran, Iran. FSR's corporate website advertised FSR as "one of the leading business groups based in iran [sic], engaged actively in various petrochemical and gas sectors." Since about March 2018, **RAHVARIAN** held the title of Managing Director of FSR and **MOKHTARI** was the Chairman of FSR.

3

10. Ayegh Isfahan Manufacturing Company was located in Iran and was engaged in the petrochemical industry.

11. WTH was located in the United Arab Emirates and was engaged in the petrochemical industry and shipping business.

12. Bitubiz was located in the United Arab Emirates and used the corporate email address bitubizfze[@]gmail.com ("the Bitubiz email account"). Bitubiz held a commercial trade license, issued by the Government of Sharjah in the United Arab Emirates, for "General Trading (Including Petroleum Products Trading)."

## The Conspiracy

13. Beginning in or before March, 2018, and continuing until at least September 2020 in Iran, and elsewhere outside of the United States, **AMIRREZA RAHVARIAN** and **BEHROUZ MOKHTARI**, the defendants, and others known and unknown to the Grand Jury, did knowingly and unlawfully combine, conspire, confederate, and agree to commit an offense against the United States, and to defraud the United States and an agency thereof, to wit: to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701 to 1707 and Part 560 of Title 31, Code of Federal Regulations.

## Object of the Conspiracy

14. The object of the conspiracy was to evade U.S. sanctions by engaging in business activities with and on behalf of Iranian entities without first obtaining required OFAC licenses, in violation of United States economic sanctions.

## Manner and Means of the Conspiracy

15. It was part of the conspiracy that the defendants, who were U.S. citizens, and other conspirators provided services to Iranian entities. Specifically, the defendants and other conspirators engaged in transactions involving petrochemical products of Iranian origin, including refining petrochemical products and transporting them by sea. As a part of this business, the defendants and other conspirators engaged in U.S. dollar transactions that were processed through bank accounts located in the United Arab Emirates on behalf of at least one Iranian entity.

16. It was further part of the conspiracy that the defendants and other conspirators engaged in the business of petrochemical production, shipping and sales in Iran and outside of the United States through the use of the FSR Network, a conglomerate of companies, some of which were based in Iran and some of which were based in the United Arab Emirates, as well as other business activities.

17. It was further part of the conspiracy that the defendants and other conspirators used e-mail accounts to communicate with one another and to share records relating to the operation and financial transactions of the FSR Network.

18. It was further part of the conspiracy that the defendants and other conspirators used a Bitubiz bank account at a bank, located in the United Arab Emirates, having an account number ending in 8819 ("the Bitubiz x8819 account) to conduct international financial transactions and receive international financial transfers through United States financial institutions on behalf of one or more Iranian entities.

19. It was further part of the conspiracy that the defendants and other conspirators tracked and caused to be tracked the financial transactions that were conducted through the

Bitubiz x8819 account on financial ledgers that they then shared on a frequent basis with each other via e-mail.

## Overt Acts

20. In furtherance of the conspiracy and to effect the objects of the conspiracy, at least one of the co-conspirators performed and caused to be performed one or more of the following overt acts, among others, on or about the dates set forth below in Iran and elsewhere.

    a. On or about January 16, 2019, **RAHVARIAN** sent an email, using the RAHVARIAN GMAIL account, to Company 1 and copied **MOKHTARI**'s MOKHTARI BIZ account. The email included the following description of RAHVARIAN's relationship to FSR and the services that FSR provided to the Iranian oil industry:

> I would like to give you a little bit of background about our company, Farashimi Rooz. Mr. Mokhtari is the owner and he is a well know businessman who has been engaged in a variety of business around the globe. I, Reza Rahvarian, am the managing director of Farashimi Rooz which is engaged in producing and exporting variety of Bitumen derivatives from Iran to around the globe; and proper logistics planning entails considering logistical aspects throughout the various stages of the procurement process.
>
> Farashimi Rooz is an excellent accomplishment in the field of storage and exporting a variety of petrochemical products in bulk and has a terminal in Shahid Rajai's port, Bandar Abbas, and Bushehr as well. Our Shahid Rajaie's terminal has a capacity of nearly 16,000 tons (five storage tanks) and Busher's terminal has a capacity of nearly 7,000 tons (two storage tanks) for bitumen exports. Furthermore, we have holding company includes a pipe production plant in Semnan and a bitumen refinery in Isfahan which is engaged in exporting bitumen in drums.

    b. On or about October 9, 2019, an email was sent from the Bitubiz email address to **MOKHTARI**'s BEHROUZ YAHOO email and **RAHVARIAN**'s RAHVARIAN FSR email account, among others, that attached multiple FSR Network financial ledgers.

    c. On or about February 18, 2020, an individual using the title of "Commercial Expert" for FSR emailed multiple recipients, including **RAHVARIAN** at his RAHVARIAN FSR account. The subject of the email was "Bitubiz License" and included an attachment which

6

appeared to be a commercial trade license issued by the UAE, with an Owner listed as Savitha, for activity of "General Trading (Including Petroleum Products Trading)."

    d.    On or about June 22, 2020, Bitubiz account x8819 received a $165,198 wire transfer from Company 2 which was subsequently recorded in the FSR Network ledgers as a credit to "AYEGH" for $165,058 on "23.06.2020" with a description that matched the first part of Company 2's name.

    e.    On or about August 11, 2020, Bitubiz account x8819 received a $70,411 wire transfer from Company 3, which was subsequently recorded in the FSR Network ledgers as a credit to "AYEGH" for $70,376 on "11.08.2020" with a description that matched the first part of Company 3's name.

    f.    On or about September 2, 2020, Bitubiz account x8819 received a $168,108 wire transfer from Company 2, which was subsequently recorded in the FSR Network ledgers as a credit to "AYEGH" for $168,068 on "03.09.2020" with a description that matched the first part of Company 2's name.

    g.    On or about December 28, 2020, **RAHVARIAN**, using his RAHVARAIN FSR email account, sent an email to **MOKHTARI**'s MOKHTARI BIZ email account with the subject line "FW: Daily Statement in accordance with the excel." Attached to the email were multiple financial ledgers, bearing dates between at least October 2017 and September 2020, and reflecting financial transactions among and between the FSR Network companies.

18 U.S.C. § 371

## FORFEITURE NOTICE

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), as a result of any defendant's conviction on this Indictment.

2. As a result of the offense alleged in this Indictment, the defendants,

**AMIRREZA RAHVARIAN**
**and**
**BEHROUZ MOKHTARI**

shall forfeit to the United States all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense alleged in this Indictment.

### Substitute Assets

3. If, as a result of any act or omission by any of the defendants, any of the property subject to forfeiture, identified above:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853, as incorporated by 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)

*Erek J. Barron /KE*
Erek L. Barron
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

12/09/2021

Date