



## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

At all times relevant:

The defendant, Behrouz Mokhtari ("Mokhtari"), was a native of Iran and a naturalized citizen of the United States. Mokhtari maintained a residence in Virginia as well as in Tehran, Iran.

Amirreza Rahvarian ("Rahvarian") was a native of Iran and a naturalized citizen of the United States. Rahvarian was a resident of Maryland prior to moving to Tehran in or about 2016.

### The International Emergency Economic Powers Act and Iranian Transactions and Sanctions Regulations

Pursuant to authority granted by the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1707, the President of the United States has imposed comprehensive sanctions on Iran. To implement the sanctions, the Secretary of the Treasury, through the Office of Foreign Assets Control (OFAC), promulgated the Iranian Transactions and Sanctions Regulations (ITSR).

Absent permission from OFAC in the form of a license, the ITSR prohibit, among other things, "the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, technology, or services, to Iran … including the exportation, re-exportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that: (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or (b) Such goods, technology, or services are intended specifically for use in the production of, for comingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the government of Iran."

The ITSR also prohibit any transaction by any U.S. person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate or cause a violation of the ITSR.

The ITSR further prohibit a United States person, wherever located, from engaging "in any transaction or dealing related to (1) goods or services of Iranian origin or owned or controlled by the Government of Iran; or (2) goods, technology, or services for exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran."



The FSR Network Conspiracy

Beginning in or before March 2018, and continuing until at least September 2020, in Iran and elsewhere outside of the United States, Mokhtari and others did knowingly and unlawfully combine, conspire, confederate and agree to commit an offense against the United States, and to defraud the United States and an agency thereof, by violating and causing a violation of licenses, orders, regulations, and prohibitions issued under IEEPA, 50 U.S.C. §§ 1701-1707, and 31 C.F.R. Part 560 (collectively "the Iranian sanctions").

Mokhtari held executive management positions and/or maintained ownership control of multiple businesses in Iran and the United Arab Emirates ("UAE"), including a company known as Alborz Rouzbahan Investment Consortium ("ARIC"). Mokhtari's interests included the following businesses, hereinafter referred to collectively as "the FSR Network:"

- Fara Shimi Rooz Co ("FSR") - FSR was an Iranian petrochemical company located in Tehran, Iran. It advertised itself on the Internet as "one of the leading business groups based in iran [sic], engaged actively in various petrochemical and gas sectors." Mokhtari held the title of Chairman of FSR. Rahvarian was the managing director of FSR in Tehran;

- Ayegh Isfahan Manufacturing Company ("AIM") - AIM was located in Iran and engaged in the petrochemical industry. Mokhtari and others held ownership interests in AIM;

- World Trade Hall ("WTH") - WTH was located in the UAE and was engaged in the petrochemical and shipping business. Mokhtari held the title of Vice-Chairman of WTH;

- Bitubiz FZE ("Bitubiz") - Bitubiz was located in the UAE. Bitubiz held a commercial trade license, issued by the Government of Sharjah in the UAE, for "General Trading (Including Petroleum Products Trading)." Mokhtari controlled some or all of the activities of Bitubiz, including financial transactions conducted with United States dollars on behalf of FSR, AIM, and/or WTH; and

- Fara Shipping, S.A. - Fara Shipping had a business address in Panama. Fara Shipping, which was engaged in the business of transporting Iranian petrochemical products, owned and operated a vessel by the name of Fara 1.

Mokhtari conspired with Rahvarian and others to evade the Iranian sanctions by engaging in business activities with and on behalf of Iranian entities without first obtaining required Office of Foreign Assets Control ("OFAC") licenses, in violation of U.S. economic sanctions. Specifically, Mokhtari and his co-conspirators used the FSR Network to provide services to

Iranian entities, including engaging in transactions involving petrochemical products of Iranian origin. Those transactions included refining petrochemical products and transporting them by sea. In the course of conducting these transactions, Mokhtari and his co-conspirators engaged in United States dollar transactions that were processed through various bank accounts located in the UAE, including a Bitubiz bank account ending in 8819 ("account 8819").

Bitubiz operated as a conduit for the FSR Network in order to conceal the fact that Mokhtari and his co-conspirators was engaging in financial transactions with Iranian entities and providing services to Iranian entities. Bitubiz maintained daily ledgers which recorded the receipts and transfers of funds. After receiving an incoming wire transfer into the 8819 account in United States dollars, Bitubiz would credit most of that amount to AIM on the daily ledgers. Examples of such transactions included:

1. On June 22, 2020, Company 2, a company located in Singapore, wired $165,198 to account 8819. The following day, Bitubiz recorded $165,058 in the daily ledger as a credit to "AYEGH" (referring to AIM) with a description that matched the first part of Company 2's name;

2. On August 11, 2020, Company 3, a company located in Malaysia, wired $70,411 to account 8819. That same day, Bitubiz recorded $70,376 in the daily ledger as a credit to "AYEGH" with a description that matched the first part of Company 3's name;

3. On September 2, 2020, Company 2 wired $168,108 to account 8819. The following day, Bitubiz recorded $168,068 in the daily ledger as a credit to "AYEGH" with a description that matched the first part of Company 2's name; and

4. In or about March, 2018, Fara Shipping sold Fara 1 to Company 4 for $641,692. Mokhtari signed the Bill of Sale on behalf of Fara Shipping. Company 4 then wired $497,308, part of the purchase price, to account 8819. Bitubiz credited $497,293 to AIM on the daily ledger with the notation "fara 1 sale tt from India."

Mokhtari and his co-conspirators frequently communicated with each other by email about their business activities and financial transactions. On December 28, 2020, for example, Rahvarian sent an email to Mokhtari with daily ledgers attached. Those ledgers, which were dated between October 2017 and September 2020, reflected financial transactions between the FSR Network companies.

At all relevant times, Mokhtari knew that, as a United States citizen, he was prohibited from engaging in business with or providing services to Iranian entities, including FSR and AIM, without first obtaining a license or permission from OFAC to do so. Neither Mokhtari nor any of his co-conspirators ever applied for or obtained any such license. Mokhtari further knew that it was unlawful to engage in transactions intended to evade the Iranian sanctions and that it was unlawful to engage in transactions or dealings related to goods or services of Iranian origin or export, including Iranian petrochemical products.

The Greenline Conspiracy

Beginning in or before February 2013, and continuing until at least June 2017, Mokhtari, a number of Iranian nationals, and other individuals did knowingly and unlawfully combine, conspire, confederate and agree to access, and did access, the United States financial system to support illicit shipments of petrochemicals products to and from Iran, in violation of the Iranian sanctions.

In furtherance of the conspiracy, in about February 2013, Mokhtari created a front company in Panama by the name of East & West Shipping, Inc. ("East & West") for the purpose of purchasing two liquid petroleum gas ("LPG") tanker vessels that would be used to transport Iranian petrochemical products in international commerce on behalf of, and for the benefit of, various Iranian entities that were associated with the Government of Iran. In about March 2013, Mokhtari, as the sole owner of East & West, entered into purchase agreements for two LPG vessels (hereinafter "LPG Vessel 1" and "LPG Vessel 2") for a total of about $38 million.[1] Shortly thereafter, Mokhtari transferred the East & West ownership interest in LPG Vessel 1 to Russell Marine, S.A. and the ownership interest in LPG Vessel 2 to Sam Shipholding, S.A. The conspirators used various entities, including but not limited to East & West, Russell Marine, S.A. and Sam Shipholding, S.A., to conceal their financial and ownership interests in LPG Vessel 1 and LPG Vessel 2.

The conspirators then used an entity known as Greenline Shipholding, Inc. ("Greenline") to control the operations of LPG Vessels 1 and 2. Through email communications from Greenline email accounts, or email accounts containing some variation of the Greenline name, the conspirators directed Company 5, a ship management company, to oversee the leasing and operation of LPG Vessel 1 and LPG Vessel 2 to transport Iranian petrochemical products from Iranian ports to various other locations and to participate in ship-to-ship transfers of Iranian petrochemical products while on the high seas. Throughout this time period, the conspirators used the United States financial system, specifically the United States Correspondent Banking System, to engage in transactions related to the hiring of the vessels and related expenses.

The conspirators frequently communicated by email about the nature and source of the products that the vessels were transporting, payment information and contracts for the use of the vessels, as well as the use of false shipping documents and other measures taken to conceal the fact that the vessels were transporting products to and from Iran in order to evade the Iranian sanctions. Mokhtari was a recipient and a sender of such email communications.

For example, on or about January 25, 2017, a conspirator sent an email to the ship management company, with a copy to two different email accounts used by **MOKHTARI**,

---

[1] Shortly before entering into those agreements, Mokhtari, signing on behalf of East & West, entered into an agreement with Company 6, in which the parties agreed to jointly purchase, own, manage and operate LPG Vessels 1 and 2. Company 6 further agreed to provide financing to East & West to make the purchase and East & West agreed to repay those funds to Company 6 at some unspecified future date.

4

regarding a contract between Russell Shipping and another entity to use LPG Vessel 1 to load and ship LPG cargo from a port in Iran.

At some point prior to May 2017, ownership of LPG Vessel 1 transferred from Russell Marine, S.A. to Russell Shipping, Inc. On or about May 30, 2017, Mokhtari, the sole owner of Russell Shipping, Inc., sold LPG Vessel 1 to be scrapped for more than $3.1 million. Mokhtari received a total of $2,862,591.12 from that sale.

Specifically, on June 12, 2017, the purchaser wired the funds for the purchase of LPG Vessel 1 to a law firm's bank account in the United Kingdom. On June 16, 2017, the law firm sent a wire in the amount of $1,339,960.84 to a Bank of America account held in the name of Mori Construction and Development, LLC ("Mori Construction") and ending in 1591. The same day, the law firm sent another wire, this one in the amount of $1,522,637.28, to a Wells Fargo bank account held in the name of Mori Construction and ending in 4626. Both wires, which totaled $2,862,591.12, bore the notation "Sale of [LPG Vessel 1]."

Mokhtari was the sole owner Mori Construction, which had a business address that was the same as Mokhtari's personal residence in Virginia. Mokhtari and his son had signature authority on the Mori Construction account at Bank of America that ended in 1591. Mokhtari had sole signature authority on the Mori Construction account at Wells Fargo that ended in 4626.

Subsequent to the receipt of the two wires, collectively the proceeds of the sale of LPG Vessel 1, in June 2017, Mokhtari conducted a series of transactions, including inter-account transfers and check payments among multiple financial accounts under his control. By September 2017, all of the proceeds from the sale of LPG Vessel 1 were located in a bank account ending in 7170 at First Republic Bank. Mokhtari and his daughter had signature authority on that account.

Mokhtari then used those proceeds to purchase a property located at 143 Kennedy Avenue, Campbell, California for $1,512,000. Specifically, on or about March 20, 2018, using funds from the 1707 account, Mokhtari purchased a cashier's check, made payable to Stewart Title in the amount of $45,000, for the down payment on the purchase of the property. Six days later, on or about March 26, 2018, Mokhtari wired $1,469,556.19 out of the First Republic account to Stewart Title for the balance of the purchase price.

At all times, Mokhtari knew that, as a United States citizen, he was prohibited from engaging in business with or providing services to Iranian entities, including engaging in financial transactions in United States dollars through the United States Correspondent Banking System, without first obtaining a license or permission from OFAC to do so. Neither Mokhtari nor any of his co-conspirators ever applied for or obtained any such license. Mokhtari further knew that it was unlawful to engage in transactions intended to evade the Iranian sanctions and that it was unlawful to engage in transactions or dealings related to goods or services of Iranian origin or export, including Iranian petrochemical products.

BM

SO STIPULATED:

_____
Kathleen O. Gavin
Assistant United States Attorney

_____
Behrouz Mokhtari
Defendant

_____
Dennis E. Boyle, Esquire
Counsel for Defendant